## HENRY *v.* DOBLE.

---

PATENTS; INTERFERENCE; DILIGENCE; ORIGINALITY; ADMISSION.

1. Where it appears that one of the parties to an interference is not an original inventor, the question of the diligence of the other party is immaterial.
2. Where, in interference proceedings, it appears that plans and specifications for a power plant, submitted by an electric company to a construction company with which one applicant was connected, disclosed the invention, and that such applicant prepared a proposal to meet their requirements, he cannot be held to be an original inventor.
3. If there is any doubt that an invention involved in interference was disclosed by certain specifications to the perception of one of the applicants, who prepared a proposal to meet their requirements, such doubt is removed by the applicant's admission on the witness stand that they suggest the subject-matter of the interference.

No. 330. Patent Appeals. Submitted January 11, 1906. Decided February 6, 1906.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case.                         *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. L. S. Bacon, Mr. J. H. Milans,* and *Mr. N. A. Acker* for the appellant.

*Mr. Charles E. Foster* for the appellee.

Mr. Chief Justice Shepard delivered the opinion of the Court:

This interference, as declared, involved the applications of three parties, namely, that of George J. Henry, filed April 18, 1902; that of William R. Eckart, filed May 18, 1903; and that of William A. Doble, filed October 17, 1903.

The issue embraces twelve counts, as follows:

"1. In a water-wheel nozzle, devices to move or deflect the same, so that the jet therefrom will impinge upon wholly, in part, or pass the water-wheel buckets, and, in combination therewith, devices separately adjustable within the nozzle to control the volume of water discharged therethrough, substantially as described.

"2. In combination with a pivoted nozzle of the character described, means for adjusting said nozzle on its pivot, and instrumentalities for regulating the cross-sectional area of discharge from the nozzle, said instrumentalities being carried by the nozzle and free to move therewith, whereby the same may be adjusted irrespective of the position of the nozzle, substantially as described.

"3. In combination with a nozzle of the character described, primary means whereby an approximate adjustment may be given said nozzle to vary the position of the stream discharged therefrom, and secondary means on the nozzle for regulating the cross-sectional area of the stream to correspond with the adjustment of the stream's position, substantially as described.

"4. In combination with a pivoted nozzle mounted to swing in vertical planes and of the character described, means for regulating the cross-sectional area of discharge from the nozzle, said instrumentalities being carried by the nozzle and free to move therewith, whereby the same may be adjusted irrespective of the position of the nozzle, substantially as described.

"5. In combination with a single-discharge nozzle of the character described, primary means whereby an approximate adjustment may be given said nozzle to vary the position of the stream discharged therefrom, and secondary means on the nozzle for regulating the cross-sectional area of the stream to correspond with the adjustment of the stream's position, substantially as described.

"6. The combination with the line or supply pipe, of a discharge nozzle movably connected thereto, means for raising and lowering the nozzle in accordance with the load variations, and means whereby the outlet area for the stream ejected from the nozzle is varied to meet the requirements of the load changes.

"7. The combination with a nozzle, of means for raising or lowering the same proportionate to the load variations, and means for varying the stream's area in accordance with the variation of the nozzle to the load changes.

"8. The combination with a deflectable nozzle, of means for varying the position thereof in accordance with the load variations, a longitudinally movable plug located within the nozzle, and means whereby the plug is moved in or out to vary the outlet area for the stream to correspond with the variation of the nozzle.

"9. The combination with a nozzle, of means for varying the direction of the stream ejected therefrom to meet the requirements of the load variations, and means whereby the outlet area for the stream is varied to compensate for the load changes.

"10. A nozzle of the character described, provided with means for adjusting the position thereof, in combination with means whereby the discharge from the nozzle may be regulated when said nozzle occupies any of its adjusted positions without interfering with such adjustment, substantially as described.

"11. In a hydraulic nozzle, mechanism for regulating the amount of water discharged therefrom, in combination with mechanism for moving the nozzle so as to direct or deflect the stream, substantially as described.

"12. In a hydraulic nozzle, mechanism for regulating the amount of water discharged therefrom, in combination with au-

tomatic mechanism for moving the nozzle so as to direct or deflect the stream, substantially as described."

The Examiner of Interferences described the invention and the meaning of the several counts of the issue in the following language, which we adopt:

"The invention in controversy is an improvement in that form of water wheel in which a jet of water under high pressure is directed tangentially toward the wheel and impacts upon buckets mounted on the periphery thereof. In order to compensate for the variations in the load upon the machinery driven by the water wheel, it has been the practice to either reduce the flow of water by means of a valve or gate, or to deflect the jet from the buckets by turning a pivoted nozzle or by interposing a deflecting plate or hood in the path of the water projected from a stationary nozzle. All of these expedients are old. The issue of the interference, in its broadest aspect, is the combination of means for deflecting the stream from the buckets of the water wheel, with means for varying the flow of water. The advantage of this combination lies in the fact that it permits compensation for the momentary variations in load by the action of a governor upon the mechanism for deflecting the jet of water, and also provides for controlling the volume of water in the jet to compensate for the less frequent changes in load, or to meet variations in the water supply. The disadvantage of the former means of control, that by deflecting the jet, lies in the resulting waste of water. Its advantage is that rapid changes in load can be met without injury to any part of the system. Owing to the fact that impact water wheels are operated under a head of water often upwards of a thousand feet, it is not practicable to compensate for rapid variations in load by throttling the water supply, as the sudden stoppage of the flow of water causes a 'pipe ram' or 'pounding' which sometimes results in rupturing the pipe. The less frequent variations in load may, however, be successfully taken care of by gradually throttling the water supply, and this means has the advantage of economizing water.

"Counts 1 to 8 inclusive, 10, 11, and 12 of the issue are lim-

ited to a movable nozzle for deflecting the jet of water. Count 9 is broad enough to cover a stationary nozzle in connection with a plate or hood for deflecting the stream after it has left the nozzle, the only limitation being the phrase 'means for varying the direction of the stream ejected therefrom.'

"Count 1 is limited to 'devices within the nozzle' to control the volume of water, and count 8 is limited to a 'longitudinally movable plug located within the nozzle' for the same purpose. The remaining claims are broad enough to cover other controlling means, including certain devices referred to in the testimony in which the amount of water flowing from the nozzle is controlled by a 'cut-off hood' which moves transversely over the end of the nozzle and is external thereto. The 'cut-off hood' differs from the deflecting plate or deflecting hood, above referred to, in that the former reduces the amount of water by contracting the outlet orifice but does not change the direction of the stream, while the deflecting plate does not affect the amount of water or change the outlet area of the nozzle, but changes the direction of the stream after it has left the nozzle.

"From the foregoing it appears that counts 2 to 7, 10, 11, and 12 are limited to the combination of a movable nozzle with means for regulating the amount of water discharged, said means being broadly stated so as to cover either an internal needle, a cut-off hood, or other form of valve. Count 1 is limited to the combination of a movable nozzle with means 'within the nozzle' to control the volume of water discharged, and count 8 to the combination of a movable nozzle with 'a longitudinally movable plug located within the nozzle.' Count 9 is the broadest claim, and is limited merely to the combination of 'means for varying the direction of the stream' with means for varying the outlet area thereof."

After an exhaustive review of the evidence, the Examiner of Interferences awarded priority to Doble, but, under the provisions of Rule 126, directed the attention of the Commissioner to the fact that he was of the opinion that Doble's evidence established prima facie the existence of the statutory bar of public use as to count 9 of the issue.

Eckart, who was a witness in the case, took no appeal from this decision, and has, therefore, passed out of the case.

Henry appealed to the Examiners-in-Chief, who likewise awarded priority to Doble. They did not agree with the Examiner of Interferences as to the public use of the invention as described in count 9, and further called the attention of the Commissioner to the fact that in their opinion counts 10, 11, and 12 are not patentable because anticipated by the old construction comprising a movable nozzle connected with a Lombard governor, a supply pipe connected to the nozzle, and a gate valve in the supply pipe.

On appeal by Henry to the Commissioner the decision awarding priority to Doble was affirmed. Apparently he took no notice of the suggestion of the Examiners-in-Chief respecting counts 10, 11, and 12. The question of public use he expressly reserved for consideration after the question of priority shall have been finally settled.

Neither the Examiner of Interferences nor the Commissioner assigns any particular date to the conception of Doble, but find merely that he had it prior to April, 1900. The Examiners-in-Chief fix the date of his conception as early in 1898.

As Eckart, who seems, moreover, not to have been an inventor at all, is out of consideration, it is immaterial to determine whether Doble is entitled to the earlier date. Henry's testimony is insufficient to show that he had any knowledge of the invention earlier than April 23, 1900, and all of the tribunals have concurred in finding that he was not an original inventor at all. If he was not, the question of Doble's diligence is immaterial.

It appears that on April 23, 1900, the Standard Electric Company submitted plans and specifications to several construction companies for the construction of a proposed power plant. These were submitted, among others, to the Pelton Water Wheel Company, of which Henry was then an employee. Acting for that company, Henry made some drawings, between April 23 and May 10, 1900, in connection with their proposal for the con-

struction aforesaid, which he claims as his disclosure of the invention.

Among the specifications of the Standard Electric Company appears the following:

### NOZZLES.

Deflecting nozzles with changeable tips of approved design and material will be used, one for each runner. The mechanism, under control of a Lombard governor, will be such that one nozzle at a time will be deflected, but in case of a short circuit both nozzles will be acted upon to the extent of deflecting both streams off of the wheels. The object of this arrangement is to enable one wheel gate to be closed at any time, and by means of the other wheel to operate the generator at half power. Further, to provide for a three-quarter load without excessive waste of water, one of the deflecting nozzles will be fitted with a "needle valve" so arranged that a nozzle of 3-inch diameter can have its area reduced one half (full closure is not required) while the generator is running. This adjustment is to be made by hand without in any way interfering with governor's action on the deflecting nozzles. All nozzles must be operated in a vertical plane, and must be guided so that the stream from the nozzles will properly impinge upon the buckets in every position. The nozzles will be properly balanced with levers and adjustable weights, so that the governor's action may be uniform. The rock shaft and lever mechanism between the governor and nozzles must be properly arranged and secured to prevent accident from bolts, or pins working loose, or levers breaking.

At that time, both the deflecting nozzle and the needle valve were well-known devices; and the evidence tended to show that Doble suggested the combination of the specification.

The drawings accompanying the specifications show the general arrangement of the proposed construction comprising the main supply pipe, two branch supply pipes leading to each of

two wheels, a gate valve in each supply pipe, and a Lombard governor. This governor acts to deflect the pivoted nozzle toward or away from the axis of the wheel so that more or less of the water jet may strike its buckets.

It is conceded by counsel for Henry that, if the specifications aforesaid disclose the invention, he cannot be found to have conceived the broad invention of the issue. He contends, however, that they merely suggest the desirability of providing an automatic governing device with means for hand control; that is to say, a result to be acomplished, without describing the means by which that result may be attained.

The contention is without foundation. The specifications expressly require the deflecting or deflectable nozzle provided with a needle valve to reduce the area of its outlet as occasion might from time to time require. This reduction is to be one half. Merely reducing the supply of water to the nozzle would not have that effect. To reduce the area of the outlet, therefore, it was obviously necessary to place the specified needle valve in the outlet; and this is all that Henry did.

If there could be any doubt that the invention of the issue was disclosed by these specifications to the perception of Henry, who undertook the preparation of a proposal to meet their requirements, it is removed by his own admission under examination as a witness. The specifications, with which, of course, he was perfectly familiar, having been read to him, he was asked if they did not suggest the subject-matter of the interference. His reply was: "Yes, I consider that it suggests it."

It is unnecessary to prolong the discussion. The Commissioner was right in holding that Henry cannot be regarded as an original inventor, and in awarding priority to Doble. His decision must therefore be affirmed. It is so ordered, and that this decision be certified to the Commissioner of Patents as required by law. *Affirmed.*